|  |  |
|---|---|
| ) | United States District Court |
| Andrew U. D. Straw        ) | Northern District of Indiana |
| Plaintiff,        ) |  |
| ) | Case No.: 3:14-cv-1772 |
| v.        ) |  |
| Brenda Sconiers, and        ) | Jury Trial Demanded |
| Thomas Dixon, Sconiers'        ) |  |
| Attorney, and        ) |  |
| St. Joseph County        ) |  |
| Superior Court,        ) |  |
| Defendants.        ) |  |

## AMENDED COMPLAINT

1. I, plaintiff Andrew U. D. Straw, having considered the Court's ORDER of December 30, 2014, ask for leave to amend under Federal Rule of Civil Procedure 15(a)(2).

2. Rule 15(a)(2) provides that, "*Other Amendments*. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Because it is now past the time wherein an amendment by right may be had, I seek leave to amend.

3. This amended complaint has exhibits attached. These provide the evidence of tortious conduct that I seek to remedy in this court under several different legal theories. They also show that justice would be served by allowing this amended complaint.

1

DEFENDANTS

4. Upon review of the facts, I have decided that the defendants in this action will be attorney Thomas M. Dixon, Indiana Supreme Court Employment Law Director and ADA Coordinator Brenda Rodeheffer, individually and as an officer of the Indiana Supreme Court, and the Indiana Supreme Court. Because the Attorney General's office has already appeared in this case on behalf of the State of Indiana and Dixon has appeared on his own behalf, and the Attorney General will represent Rodeheffer in her capacity as a state officer, service will be through the Court's CM/ECF system.

COUNTS

5. The counts I make include intentional infliction of emotional distress against Defendant Dixon, intentional infliction of emotional distress against Rodeheffer (individually and as a Court employee), and 42 U.S.C. § 1983 against Rodeheffer and the State of Indiana for violations of my civil rights as a person with physical and mental disabilities.

FACTUAL RECITATIONS AND EXPLANATION

DISABILITIES BACKGROUND

6. My disabilities began with exposure to PCE, TCE, and other chemicals on Camp LeJeune Naval Base while my father was serving there as a Marine in 1969. I was born at Camp LeJeune Naval Hospital. (Exhibits A1, A2) The poisoning issue has been covered in the media, and was the cover story in *Newsweek* on July 25, 2014. (Exhibit B) The poisoning was the topic of a book, *A Trust Betrayed: The Untold Story of Camp LeJeune and the Poisoning of Generations of Marines and Their Families*, by Mike Magner, 2014.

2

7. While my father was training for his deployment to Vietnam, I was being poisoned by the very base where he trained.

8. The Janey Ensminger Act of 2012, signed by President Obama, recognized officially that the poisons at Camp LeJeune caused at least a list of 15 different ailments, including breast cancer and neurobehavioral effects.  The Veterans Administration lists these on its Camp LeJeune Public Health website.  (Exhibit C)

9. Among my disabilities from the poisoning at the Base are bipolar disorder, migraines, anxiety, and severe allergies for which I took desensitization shots for 14 years.  My weakened immune system resulted in hospitalization for pneumonia.  I have a diagnosis letter from my psychiatrist which proves the bipolar, which is the principal disability at issue here.  (Exhibit D)

10. My mother, Sandra, died of breast cancer which was diagnosed at age 46.  (Exhibit E)  She died during my second year of law school, February 1997.  (Exhibit F)

11. I turn 46 in March of 2015.  (Exhibits A1, A2)

12. As a result of her death, I dropped one class, the one I felt was most stressful to me.  This was Trial Process.  I withdrew from only one class during law school.  (Exhibit F, p. 3)

13. My U.S. Navy Federal Tort Claims Act file number for my poisoning claim is 140367.  I am the administrator of my mother's estate as per *In Re: Estate of Sandra Stevens*, 32D05-1409-EU-000204 (Hendricks Sup. Ct. #5).  Sandra Stevens' Estate's U.S. Navy FTCA file number for her wrongful death is 150475.

14. I have scoliosis, the only one in my family with the exception of my daughter, who had back surgery to stabilize her spine with rods and screws on December 11, 2011.  I attribute this to the teratogenic qualities of the poisons I was exposed to.

3

15.     I have inquired with the National Scoliosis Foundation to learn more about the chemical and genetic causes of this condition my daughter and I have.  I have considered attaching the photos of my daughter's surgery, but am choosing not to in order to protect her privacy.

16.     I have been in the hospital for bipolar about 10 times.  The first time was following my mother's death, after I graduated from law school, in 1998.

17.     My proposed bill to provide compensation and medical care and other protections was covered on KLTV on January 27, 2015: http://kltv.videodownload.worldnow.com/kltv_20150127194806120AA.mp4

18.     Other Children of Camp LeJeune are currently lobbying for this bill to pass Congress.  (Exhibit PP)

## WORK AND DISABILITIES

19.     My mother's cancer was discovered in December 1994.  I went with her to the oncologist.  This is about the time I learned I was admitted to law school also.  I began law school in August of 1995.

20.     As a law student, I was approximately at the middle of my class, but I was extremely active on the Bloomington campus of Indiana University.  A friend and I founded College Democrats on the campus, which now has over 500 members.  I represented the Law School in the IU Student Association, the student government.  I was Dean Alfred C. Aman's research assistant, and I also helped Professor F. Thomas Schornhorst and Professor Paul Craig of Oxford and was a student member of the Law School Educational Policy Committee.

4

21.      The worse my mother's cancer got, the harder I worked, until every minute was planned.  As a result, the IU Student Association recognized me as one of the most active student leaders on the campus, while I was a 1L law student.  (Exhibit G)

22.      After law school, I worked for Alan M. Voorhees, a famous transportation planner who was on a UDT-11 (SEAL) team during WWII in the Pacific.  His "gravity theory" of traffic flow made the Interstate Highway System possible, especially in urban areas, and he planned the Metro in Washington as well as transportation in lower Manhattan.  He owned an important aerospace firm, Autometric, which protects American civilian and military air traffic with satellite surveillance, as well as several other high tech companies that worked in national defense and with the FBI.

23.      I was his corporate counsel, and he involved me heavily in his court automation and other projects.  (Exhibit H)

24.      To learn the paper flow of the court, I worked with Clerk Rosa Forrester in Richmond County, Virginia, and with Judge Joseph E. Spruill, Jr., former president of the Virginia State Bar. Judge Spruill trusted me with the constitutional research for a triple murder-arson trial that came before him.  This case was also an opportunity to arrange documents and categorize them for Clerk Forrester.  We also had family law and civil cases.

25.      I worked directly with Mr. Voorhees' cutting edge court records automation system, and I provided feedback on the system to the programmers in Russia who made upgrades based on my suggestions.  I did similar things for Lizardtech, which developed the image compression software for the FBI fingerprint database.

26.      While working on the court automation project, I came up with a proposal for a statewide e-filing system for the Virginia Supreme Court using the various technologies and paper flow information I had learned.  I represented Alan M. Voorhees before

5

legislative committees, in meetings with the Virginia Supreme Court staff, and with court clerks statewide.

27.     The Virginia State Bar invited me to be a member of its new Task Force on Technology, and I became the Education of Bench and Bar committee's co-chair. (Exhibit I)

28.     My grief over my mother's death was not over in 2000. When Mr. Voorhees told me his wife was dying of cancer, it caused me to become very sad, and unwell.

29.     At the time, my wife was finishing her Ph.D. in Chinese documentary film and media studies, so moving back to Bloomington, Indiana, was wise for us.

INDIANA SUPREME COURT: STATISTICAL ANALYST

30.     I applied for a job with the Indiana Supreme Court while still working for Mr. Voorhees and on the recommendation of Dean Robel at the Law School and former Dean Aman, and Mr. Voorhees, the Court hired me to be its statistical analyst in August of 2000. (Exhibit J)  Note the list of duties in the job description and the "very high" level of responsibility.  I never received the performance review promised in the hiring letter.

31.     On February 22, 2001, I was in a head-on car accident that nearly took my life and the life of my passenger, Jenny Bauer, a colleague at the Supreme Court.  We were on our way to work. (Exhibit K)

32.     My legs were crushed and my right hip.  (Exhibit L – total hip replacement, 4/11/2012)

33.     When I returned to work, in July of 2001, my boss, Kurt Snyder began complaining that I did not walk fast enough, that I was not working fast enough.  He complained that I was using the Internet too much.

6

34.     This despite the fact that I was designing the new Supreme Court webpage, communicated with the state trial judges about the new system to provide them email, and did the normal statistical work covering 400 courts.

35.     Mr. Jeff Bercovitz, a senior staff member in the Judicial Center, told me that my job had too many responsibilities for one person and when he helped design the role, and that is what he said to the others.

36.     I worked with Mr. Bercovitz on the weighted caseload study and analysis, and several months after I was fired, he gave me recognition for the work I did. (Exhibit M, p. 1 and p. 3) The Chief Justice gave me no credit for any of the work I did, including my work with deaf and blind court users, which I did on my own initiative.

37.     Despite my accident and its aggravation of my bipolar disorder such that I was sluggish and found it difficult to concentrate, I had national recognition for an idea I came up with to help domestic violence victims.

38.     In 2000, President Clinton made the first presidential webcast, on June 24, 2000. (Exhibit N) In this webcast, the president announced an e-government contest. The president said,

> "Third, in conjunction with the nonprofit Council for Excellence in Government, we're launching a major competition to spur new innovative ideas for how Government can serve and connect with our citizens electronically. The Council will award up to $50,000 to those students, researchers, private sector workers, or Government employees who present the **most creative ideas**." (Exhibit N, p. 2)

7

39.      Students at the Kennedy School of Government at Harvard and Council for Excellence staff reviewed and narrowed down the entries to eight national finalists.

40.      My idea for a database of protective orders, updated in real time at the trial court level and available to police across the country immediately, **was one of these eight national finalists**. (Exhibit O)(Exhibit P)

41.      I had worked with the Council for Excellence, had attended their leadership and innovation seminars, and trained with senior officials at Health and Human Services in the Council's government leadership programs.  Mr. Voorhees had provided their office space in Washington and start-up funds in the early 1980s, and he went with me to meet the president of the Council for Excellence.  The Council had all ex-US presidents on its board.

42.      There was no recognition from the Court when I received this national honor, but Justice Sullivan gave me approval to go to Washington to present it, 2 weeks after I returned from my accident.

43.      Instead, what happened is that I received the criticism mentioned above.  This idea apparently was much more popular than the Chief Justice admitted, because after he fired me, he sought out a federal grant and spent that money to build my idea with no reference to the Imagine E-Government Award.  (Exhibit Q)

44.      This was both dishonest and disability discrimination, to take my idea in this way after having treated me so poorly, firing me, as the former Chief Justice of Indiana did on July 11, 2002. This was one month after I was admitted to the Indiana bar.

45.      When I came to the Indiana Supreme Court, the reason I was hired was my background working on trial court technology

and document automation technology.  My protective order database idea was no different from my other work except for the fact that I came up with the idea on my own, no one else at the Court.  I had received a great deal of training in a short time in Virginia, and in the Mid-Atlantic this was recognized.  (Exhibit R)

46.     I never received recognition for my initiative to get a vision-impaired trial judge JAWS software so he could use his computer.  I did not receive recognition when I went to the Indiana Association of the Deaf and talked with them about the new trial court transcription automation system I was staffed.

47.     When I work on something, a disability aspect always emerges.

48.     As the Court may be aware, Indiana's Board of Law Examiners asks disability-related questions on its application, and I answered them honestly.  I said I had bipolar disorder.

49.     Immediately after this, my boss at work, Ron Miller, started making negative comments about people who have bipolar disorder.  He put all of my work tasks on a huge white board in the hallway outside my office and said when you get something done, tell me and I will cross it off.  Miller sent me to get remedial Microsoft Excel training.  I felt humiliated by everything Miller did.

50.     When I offered to help with the new Case Management System, which ultimately failed under his leadership, costing the state millions of dollars, he did not even answer as I stood in the doorway.

51.     I had warned the Executive Director, Lilia Judson, by email that the federal government was investigating Computer Associates.  Like with Miller, I never received any response.

52.     Later, in 2007, I worked on a major international corporate fraud audit, and translated hundreds of pages from Italian into English to facilitate the government investigation.

53.     I worked as corporate counsel for a famous entrepreneur, Alan M. Voorhees, whose company invented the bar code used in retail.  He was worth hundreds of millions of dollars, and I worked directly for him, my office next to his.

54.     But once I told the court (privately, I thought) that I had bipolar on its bar exam application, I was not worth a reply from my superiors.  Apparently, having bipolar meant nothing I said was reliable, my work product was automatically poor despite the evidence otherwise, and my accomplishments were to be picked like cherries for themselves.

55.     But the SEC *was* investigating Computer Associates in 2002. The evidence is available on the Internet. (Exhibit S)  There were federal indictments and the CEO of Computer Associates was convicted and got a 12-year federal sentence for securities fraud and obstruction of justice.  (Exhibit S1)

56.     Ignoring my advice and firing me had consequences.  The Indiana Law Blog stated that over $6 million was spent on a system that simply did not work.  The money went to Computer Associates, a company obviously not reliable.  It is ironic in the extreme that the part of the system that did not work right was its ***accounting module***, to take care of court fines and costs.  (Exhibit T)

57.     I took the bar exam in February of 2002.

58.     I passed the bar exam.  I had a character and fitness interview, which went fine.  I had no criminal record and in fact I was admitted to practice in Virginia in 1999.

59.     But my bipolar disorder was an issue for the Board.  I was ordered to come before a room full of people, some of them people I worked with at the Court.  I was interrogated on my bipolar disorder and forced to answer extremely sensitive private information about my health, in particular, every time I had ever been manic.  Again, in front of people with whom I worked at the Court.

60.     The Board forced me to sign a consent agreement before it would give me a law license.  (Exhibit W)

61.     All of this was very upsetting, and when I was sworn in on June 7, 2002, some of those same people who interrogated me were present.

62.     I became unwell the night of my swearing in as an Indiana attorney, and called my doctor.  Doctor Michael Wenzler of Bloomington told me to stay home from work for four weeks.

63.     I gave the note to my work, stayed home for four weeks, and when I came back to work, Lilia Judson called me into her office and fired me.  I was escorted out of the building by two large security guards.  This was July 11, 2002, 11 days before my daughter's birthday.

64.     Lilia Judson said to me before I left that "at least now you have your law license."

65.     Justice Sullivan, who was not my direct supervisor, was the person who showed me humanity after my car accident.  (Exhibit X)  I appreciate him, but the decisions about my work lay with Executive Director Lilia Judson and Director Ron Miller once I revealed I had my bipolar disorder.

11

66.     In 2006, the Board of Law Examiners threatened to take my law license away unless I continued doing what the consent agreement demanded that I do.

67.     I responded that the Board was violating the Americans with Disabilities Act, Title II, as explained in *Tennessee v. Lane*, 541 U.S. 509 (2004).  (Exhibit Y)

68.     The Board immediately thereafter removed the conditions on my license.

69.     There was a newspaper story in the South Bend Tribune in 2010 about trial court statistics and why they are so wrong.  I contacted the reporter and gave my opinion as the former statistical analyst in charge of that for all 400 courts.

70.     Lilia Judson insulted me in a follow-up story on November 14, 2010, stating that I "had no authority" to talk about court statistics and that I was merely a "disgruntled" ex-employee.  She admitted that there were mistakes to the reporter, which is what I was saying.  (Exhibit U)

71.     On March 2, 2014, I asked the Indiana Supreme Court to hire me to address the disability rights matters I had experienced, but Brenda Rodeheffer on March 20, 2014, stated that no position like that was open and I would not be hired to do any such thing. (Exhibit V)

72.     I filed a **Petition for Redress of Grievances** on August 15, 2014, with the Indiana Supreme Court because I felt it had violated my Indiana constitutional rights, my rights as a human being, and my federal constitutional rights in discriminating against me as a continuous matter over a long period of time. (Exhibit Z)

73.    The Clerk of Court, Kevin S. Smith, refused to accept my petition by letter on August 28, 2014, stating that the Indiana Supreme Court had no original jurisdiction to review its own actions in how it treated its employees and people who applied to its agency for bar admission.  (Exhibit AA)

74.    I submitted the Petition again with further explanation, including Indiana Constitution, Article 7, Section 4, and copied it to all members of the Indiana House and Indiana Senate, as is my right under Indiana Constitution, Section 31, Right of Assemblage and Petition.  Clerk Smith rejected it again, despite this language:

> Section 4. The Supreme Court shall have no original jurisdiction except in **admission to the practice of law**; **discipline or disbarment of those admitted**; the unauthorized practice of law; discipline, removal and retirement of justices and judges; supervision of the exercise of jurisdiction by the other courts of the State; and issuance of **writs necessary or appropriate in aid of its jurisdiction**. The Supreme Court shall exercise appellate jurisdiction under such terms and conditions as specified by rules except that appeals from a judgment imposing a sentence of death shall be taken directly to the Supreme Court. The Supreme Court shall have, in all appeals of criminal cases, the power to review all questions of law and to review and revise the sentence imposed.  Ind. Const., Article VII, Section 4.  (Exhibit BB)

75.    In this second letter from Clerk Smith, he referred my petition to the Court's Employment Law Director, Brenda Rodeheffer.  She again denied my petition and demands for justice on September 19, 2014.

76.    To be explained below, one of my civil rights clients has had a malpractice case against me.  *Sconiers v. Straw*, 71D07-1310-CT-

13

00265 (St. Joseph Ct. Sup. Ct.)  The plaintiff's lawyer in that case is Thomas M. Dixon, IndianaBar #18611-71.

77.     Attorney Dixon has filed emails that he received from Brenda Rodeheffer in his malpractice case.  (Exhibit DD)

78.     Note that Rodeheffer informed Dixon in these emails that she was filing a disciplinary complaint against me on September 3, 2014, 5 days after I filed my Petition for Redress of Grievances. This is strong indication that her actions were in *retaliation* for my demand for justice on the basis of the Court's disability discrimination against me.

79.     It appears the Dixon had entered only two emails from a conversation of more emails, but these two emails were entered as Exhibits C and D in the malpractice case.

80.     Rodeheffer did indeed file a disciplinary complaint on September 3, 2014, and the Indiana Attorney Disciplinary Commission demanded that I respond to it, despite the fact that nothing Rodeheffer listed in the complaint was an ethical violation of any kind.  (Exhibit EE)

81.     Ironically, just 15 days before Rodeheffer's claim, my psychiatrist, Dr. Maria Estrada, wrote a letter for me in support of taking my Virginia law license out of disabled status and putting it into active status.  She said that I was symptom-free, have not been hospitalized in 4 years, and am "quite productive."  (Exhibit BBB)

RODEHEFFER'S DISCIPLINARY COMPLAINT

82.     She made a bald statement that my mental disorder is so severe that I am unfit to practice law, and then she listed a number of things I work on, including political asylum cases for Ukrainians.

14

83.      Perhaps Rodheffer is unaware, but Russia has invaded Ukraine and over 4,800 people have been killed, and many more injured.  My fiancée, Victoria Yaroshenko, is from Ukraine and she helps me when someone needs to speak Russian.  She is a paralegal and is a graduate student at Argosy in mental health counseling.

84.      My life is probably much more international than Rodeheffer's.  I speak Italian fluently and have studied German and French, and am learning Russian.  My children are bilingual in English and Italian and have citizenships in the USA, the EU, and Oceania.  I took and passed the U.S. Foreign Service Exam in 1998 and worked for the Italian Foreign Ministry in 1995.  Just because Rodeheffer does not have such experiences does not make *me* unwell.  It makes *her* parochial, and quick to accuse me of being unfit with no cause.  Quick to discriminate and hurt me.

85.      To be quite honest, if I were in a position of authority at the Indiana Supreme Court and saw such a phony disciplinary complaint, Rodeheffer would not be there long.  The person who supervises her would also be required to explain.

86.      **That person is Lilia Judson.**  She is not done discriminating against me, apparently.

87.      Yes, I filed a lawsuit against the American Bar Association and the top 50 law schools because they are hiding the disability statistics of law school classes.  *Straw v. ABA*, 1:14-cv-05194 (N.D. Ill.)  There was good reason.

88.      The Law School Admission Council admitted to discriminating in administering the LSAT.  This is not my imagination.  The U.S. Department of Justice announced it in May of 2014 (Exhibit FF)

89.     The Department of Justice has started holding the discrimination of state supreme courts to account in their bar admissions, especially applicants with mental disabilities, like mine.  (Exhibit GG)

90.     Many civil rights organizations oppose behavior that the Indiana Supreme Court has continued to this time, similar to the Louisiana Supreme Court's, as evidenced in this letter to the Justice Department.
http://www.bazelon.org/portals/0/In%20Court/Current%20Cases/Current%20Cases/Louisiana%20Bar%20Conditional%20Admissions/National%20Support%20Letter_1-8-14.pdf

91.     It appears that the day of reckoning for discriminating state supreme courts and their discriminating court bureaucrats has arrived.  I have been waiting a very long time for it, asking again and again with rejections of my pleas.

92.     These people, Rodeheffer and Judson and Clerk Smith, have discriminated against me on the basis of the bipolar disorder that I got from being poisoned while my father was training to fight in Vietnam.

93.     My background is in law and disability rights.  Instead of my activities being evidence of mental illness, quite the contrary.  In 2013, I asked the IU-Maurer School of Law to be more accessible to students with disabilities.  Instead of filing a disciplinary complaint against me, Indiana University Provost Lauren Robel wrote, "Sparkling flying colors is the right standard, Andy. You are a brilliant lawyer. It has always been wonderful to watch your advocacy, Lauren," November 11, 2013. (Exhibit HH)

94.     After demanding that the Indiana Supreme Court and the IU Maurer School of Law and the U.S. Supreme Court and the ABA become more accessible, the 2014-2015 president of the National Association of Law Students with Disabilities, Angeli

16

Rios, contacted me. She did not say I was unfit to practice law. She said, "Wow, I have to admire your drive & passion for advancing the rights of people with disabilities...as far as I can tell it is pretty unmatched!!" December 15, 2015 (Facebook Message)

95.     I contacted the National Center for State Courts and told them that I wanted to do a study or even a book on how mental illness in lawyers is treated by state courts. Instead of saying I am unfit to practice law, Nicole Waters, Senior Court Research Association of the NCSC said, "We agree that this effort would benefit the state courts, enabling them to make more informed policy decisions with regard to mental illness and commend you on raising this important agenda." (Exhibit II)

96.     And in fact, I intend to do doctoral level work on this subject now, and that is what gave me standing in my ABA case.

97.     There is even more evidence that I am more a national expert on disability matters, rather than *unfit* to practice law. I applied to be the General Counsel of the U.S. Access Board, which sets the standards for physical disability access for the entire USA. The Access Board found me to be "qualified" for the position in 2014. (Exhibit JJ)

98.     The U.S. Army Medical Command evaluated me to be an Attorney Advisor (civilian equivalent of a Lt. Colonel), and found me to be "qualified" and referred me to the selection official in 2014. (Exhibit KK)

99.     Presumably due to my technology background and legal background, the U.S. Army Network Enterprise Technology Command found me "qualified" and referred me to the selection official for another Attorney Advisor position (civilian equivalent of Lt. Colonel). (Exhibit LL)

100.     National Council on Disability: "This is a fascinating inquiry. I confess I have never paused to consider the relation between receipt of SSDI and one's FICO score…Thanks for bringing the question to us. I'm hopeful we can find at least a few helpful bread crumbs on the hunt for the answers." Anne Sommers, National Council on Disability Legislative Director, January 7, 2015. Exhibit.

101.     Social Security Administration: "Thank you for posing what I considered to be important research and policy questions." Bob Williams, Social Security Administration Senior Advisor, January 7, 2015. Exhibit.

102.     I was a finalist for the position of Executive Director in 2013, **Indiana Protection & Advocacy Service (IPAS)**, the independent state agency which protects the rights of Hoosiers with disabilities. (Exhibit AAA)

103.     I appear to be "qualified" to do many things, but I have not, in the past 5 years, gotten an interview for anything of this kind. I believe it is because the Indiana Supreme Court is telling employers that I am **NOT FIT TO PRACTICE LAW**. It is logical that if the Employment Law Director is making discriminatory complaints against me on the basis of my bipolar disorder, she is saying the same things to people checking my references.

104.     Lilia Judson's 2002 "at least you have a law license" was a cruel joke. The Court first grudgingly gave me a license after a star chamber torture session, and even then with conditions, a consent agreement. In 2014, the Court was done with me having a law license.

105.     Its Employment Law Director filed a disciplinary complaint. Not because I violated any rule, but precisely on the grounds that I have bipolar disorder. (Exhibit EE)

106.   I give credit where credit is due.  In my letter, printed in the Indiana State Bar Association's Res Gestae, November 2014 issue, I thanked the Indiana CLE Commission for accommodating my migraines by letting me do all of my CLE online.

## THOMAS M. DIXON FACTS AND EXPLANATIONS

1. The case against Defendant Dixon relies on the following facts. He brought a malpractice case, *Sconiers v. Straw*, 71D07-1310-CT-00265 (St. Joseph Ct. Sup. Ct.), against me knowing that his client had never asked me to file any suit for her, and that his client (my ex-client) had actually signed my representation agreement agreeing explicitly that I would not do any trial work for her. Exhibit.

2. Dixon presented no evidence, written or verbal, that Sconiers had asked for this service, which I could not have done in any event because I had not at that point set up an e-filing account with the Court, which I now have and am using.  (Exhibit MM).  The fact that I was **top of my class** in Negotiations and that Trial Process was the only class in law school **from which I withdrew** are also indicative of what the situation was.  (Exhibit F)  There is, in other words, no reason to believe any malpractice occurred.

3. The trial court, located in South Bend, refused my attorney's Trial Rule 56 motion, and at this point I realized that I do not trust any Indiana court.  Neither trial nor appellate.  I directed my attorney to negotiate with Dixon for a settlement.  My unopposed assertions that Dixon's client never asked me to file anything, never asked me to do anything beyond the negotiations that were clearly laid out in the representation agreement were ignored. (Exhibit NN)

4. I explained to Defendant Dixon via email on June 5, 2013 that I have mental and physical disabilities that I was accommodating

in 2012 such that I did not wish to file any court case or prosecute one at that time.  (Exhibit OO).

5.  When I opposed the Democratic Headquarters in South Bend being inaccessible for people with physical impairments, and opposed the Indiana Democratic Party's Rule 10, which discriminates against people with mental impairments, I received threats.  Butch Morgan, the district chair and state committee member, shook my brother's hand in 2011 and told me simultaneously that there would be a lawsuit against me.  A news reporter was present when he made this threat, Jason Aubry of ABC 57 in South Bend.

6.  My brother, US Air Force Capt. Jason Lee Straw (ret), was a critical care trauma team nurse in Afghanistan and saved the lives of soldiers blown up on the battlefield.  His patients were all missing limbs, some four limbs.  (Exhibit RR)  Capt. Straw and his team saved the lives of about 40 people with the most severe injuries.  His uniform reflects it.  (Exhibit SS)

7.  My opposition to the disability rights violations was not casual.  I reported to the Department of Justice and to the Indiana Civil Rights Commission.  (Exhibit TT)  My case is before the Indiana Supreme Court now: *Straw v. Indiana Democratic Party*, 93A02-1406-EX-00399.
https://courtapps.in.gov/Docket/Search/Detail?casenumber=93A021406EX00399

8.  Sconiers appeared at the same time I was making my Indiana Civil Rights Commission complaint.  Fall of 2012, immediately after my campaign for Congress in South Bend ended.

9.  Because the lawsuit threat was there from one of the top Democratic leaders for 20 years, and Sconiers' case had no merit, and the court is in South Bend, I decided to direct my lawyer to settle.

10.     I do not trust the legal system in Indiana, even though I am licensed there.  If Butch Morgan can get the Vice Chair of the Indiana Election Commission to represent him in his losing felony trial for forging presidential ballot petitions, including forging former Governor Kernan's name, it is reasonable to believe that foul play is at work in Sconiers' case.  (Exhibit VV)

11.     Morgan wished to retaliate against me, and it is not hard to see why.  I ran against him for his district chair spot following the U.S. Census.  I did so to demand disability access at the headquarters.  (Exhibit WW)  My continued opposition was covered on ABC 57 in South Bend.  (Exhibit XX)  The original video is available here: https://www.youtube.com/watch?v=2DebpmIA0oc

12.     Dixon's judgment on legal matters can be demonstrated in the Indiana Court of Appeals case of *Dixon v. Lucero*, 71A04-0810-CV-592.  In this case, Dixon fought his ex-wife regarding child support for their three children to the Indiana Court of Appeals.  The Court rejected Dixon's arguments over and over again: "Again, we reject Dixon's premise."

13.     In that case, regarding **Dixon's request for sanctions**, the Court of Appeals cited the trial court in his case:

Well, all I can say is: There's been enough ill will and strife in this case, and that's why [you] ended up in the high-conflict classes.  I asked the parties to go to Dr. Rupley. The parties had previously been to mediation with Charlie Asher, I believe. I asked the parties to go to Dr. Rupley, and I got a report back from Dr. Rupley. I asked for comments on the report.
And I think you agreed to the recommendation -- or Petitioner agreed to the recommendation of Dr. Rupley.
**And from Mr. Dixon, what I got from you was about a five-page tirade** of all the things that are wrong with Mr. Hains, wrong with your wife, wrong with Dr. Rupley.  And since it was

addressed to me, I assume it didn't include me; but the next one may. (p. 14)
http://www.ai.org/judiciary/opinions/pdf/03090905msm.pdf

14.     Dixon's sanctions were denied.

15.     Dixon also claimed to be discriminated against in child support because he is a man. (p. 9) This claim was also rejected by the Court of Appeals.

16.     Dixon makes poor legal judgments as witnessed in his own case at the Court of Appeals, and he has demanded sanctions **without any factual basis** in that case. It is in this context that Dixon filed a malpractice case in state court without factual foundation and asked for sanctions before this Court.

17.     It is with that background that Dixon was unable to understand that entering the Supreme Court's employment law director's emails into the record was a violation of Indiana Rules of Professional Conduct, Rule 8.4(e).

18.     Dixon seems not to understand when he is hurting others.

19.     Rule 8.4(e): "It is professional misconduct for a lawyer to… state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law;"

20.     Dixon entered Rodeheffer's emails to him, announcing her disciplinary complaint and her cooperation with him, into the Sconiers case. The only purpose for this is attempting to influence the state trial court with Indiana Supreme Court **interference**.

21.     That is not how the system should work. Trial courts try issues, and then they are appealed to the appellate courts on matters of law.

22.     The Supreme Court *must not stick its finger on the scale* at the trial court level in this manner.  Dixon should not have invited it to do so.

23.     My father after leaving the Marine Corps opened his own butcher shop.  I know how important having a true scale is.

24.     A rational person can see the fact that Dixon has no evidence for malpractice and is relying on the influence of Indiana Supreme Court staff to win his frivolous case for him.

25.     Dixon has also been receiving lucrative legal work from the City of South Bend since filing this malpractice case against me. (Exhibit QQ)

26.     Mayor Buttigieg's administration approved that work for Dixon.

27.     It is Mayor Buttigieg's ADA-violating ramp at the Democratic HQ that is now under fire in *Straw v. Indiana Democratic Party*.

28.     I made an APRA request to get records about the ramp issue from Buttigieg's administration in 2012, prior to meeting Sconiers. It is now 2015 and I have not yet received the records from the City.

29.     The connections are not hard to see.  I complained as a lawyer and congressional candidate about ADA and Indiana Civil Rights Law violations in 2011 and 2012.  The Democratic boss threatened a lawsuit.  Sconiers arrives in 2012, asking only for negotiations work, which I did.  Then, in 2013, she sued me for malpractice because I did not do trial work for her.  Dixon refuses to acknowledge my disability and filed suit in October of 2013. Dixon begins to get legal work from the City of South Bend.  Dixon

gets assistance from the office that discriminated against me on the basis of disability at the Indiana Supreme Court.

30.     The just outcome would be that the Supreme Court staff are disciplined for getting involved and *once again* injuring my legal career, and Dixon held to account in his evidence-less malpractice case.

31.     With no demand for services, no demand that I even help her find someone to file suit, Sconiers has had no case.

32.     And it is even more apparent what the true motivation was when disgraced Democratic leader Butch Morgan threatened a lawsuit against me for political reasons while shaking my brother's hand in October of 2011.  Morgan did so in front of an ABC 57 reporter, Jason Aubry.

33.     When Dixon is favored with lucrative legal work by the city of South Bend (Democratic Council and Mayor), it shows his politically-motivated and disability rights-violating malpractice case is bearing fruit for him.

34.     If I had filed a federal lawsuit for Sconiers under these circumstances, it would have been **unethical** first and foremost, since I had **no instruction** to do so from my client.  Not having any instruction, I am prevented in Indiana from filing a federal lawsuit under Indiana Rules of Professional Conduct, Rule 1.2(a) ("a lawyer shall abide by a client's decisions"), since I had limited my representation as allowed by Rule 1.2(c) ("A lawyer may limit the scope and objectives of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.").

35.     Dixon has prosecuted a frivolous malpractice case against me at the state level which has stretched from 2013 to 2015.

36.     Further, Dixon refused to respect my reasons for not wanting to file any case for Sconiers in 2012, namely, my **mental and physical disabilities**.  This violates my disability civil rights.

37.     Dixon dumped poison on me every bit as much as the U.S. Navy did when I was born at Camp LeJeune.  He has accused me of malpractice and it has appeared since October 2013 on http://mycase.in.gov, the case search website of the Indiana Supreme Court.

38.     Dixon has a very healthy criminal law practice.  (Exhibit YY) Although there is nothing wrong with this, he seems to misunderstand the difference between a shadow of a doubt to relief someone of punishment, and punishing a lawyer with a *malpractice case* with a shadow of evidence.  And that evidence is interference from the Indiana Supreme Court.

39.     Malpractice complaints drive clients away, and that is why when I ask for damages as I do, they are justified by the damage Dixon did.  Combined with false and defamatory disciplinary charges refuted by my doctor even before the charge was made, and it is obvious that there is a conspiracy to end my legal career right here, right now.

40.     All involved must be accountable.

41.     Knowing that I have these disabilities before he filed his case, including physical disabilities from a car wreck, Dixon should have refrained from filing a malpractice case.  His lack of factual evidence was enough to not file, and this was more reason.

42.     In the absence of factual evidence and any reasonable legal theory, the malpractice case appears on its face to be harassment for my disabilities.

## COUNT I: INDIANA SUPREME COURT AND ITS EMPLOYEES FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

43.     The actions of the Indiana Supreme Court by its Employment Law Director, Brenda Rodeheffer, and other employees have caused me extreme emotional damage, damage to my career, damage to my ability to earn money as an attorney. Filing a disciplinary complaint based on my disability alone was meant to injure.  It did.  Sharing that complaint's existence with a lawyer who was suing me for malpractice was also meant to injure.  It did.  This is **intentional infliction of emotional distress**, which is actionable as a tort under Indiana law.  *Williams v. Tharp*, 889 N.E.2d 870 (Ind. Ct. App. 2008).  The tort is from Rodeheffer individually and in her official role, and the Court that authorized her actions must be responsible for them.  My demand is for $90,000 from Rodeheffer individually and $150,000 from the Indiana Supreme Court for intentional infliction of emotional distress.

44.     I respectfully seek this relief from this honorable court and additional relief as the Court deems fit.

## COUNT II: INDIANA SUPREME COURT AND ITS EMPLOYEES FOR CONSTITUTIONAL TORTS

45.     The repeated refusal to accept my demands for justice are due process violations, and justify my claim for damages under **42 U.S.C. § 1983**.  I also have a right to petition the government for redress of grievances under the First Amendment of the U.S. Constitution, and this must apply to state supreme courts which violate the rights of disabled citizens, myself in this case.  That right flows through the 14th Amendment as a command to the states.  It is incorporated.

46.     I also claim that my constitutional rights as a person with disabilities were violated.  I claim injury from discrimination

under the Equal Protection Clause.  What the Indiana Supreme Court and its employees did is the epitome of discrimination and intentional harm.

47.     My Social Security income statement shows that since my firing at the Indiana Supreme Court, my income evaporated. (Exhibit CCC)  Injury was severe.

48.     I seek $100,000 from due process damages by the Indiana Supreme Court and its employees' actions.  I seek $100,000 from the Equal Protection Clause violations by the Indiana Supreme Court and its employees' actions.

49.     I seek $100,000 for the violation of the right to petition the government for redress of grievances under the First Amendment.

50.     I respectfully seek this relief from this Honorable Court and any other just relief deemed appropriate by the Court.

## COUNT III: ATTORNEY THOMAS M. DIXON FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

51.     Attorney Dixon took the emails of Brenda Rodeheffer and injected them into the record of a malpractice case.  Not to shed any light on the merits of the malpractice case, because Rodeheffer's disciplinary complaint was irrelevant to that.

52.     He did so in order to show that the Indiana Supreme Court was behind him.  This was a defamatory purpose, meant to injure me and win his case in an unethical fashion.  Indiana Rules of Professional Conduct, Rule 8.4(e), prohibits attempting to use improper influence.

53.     I made a complaint to the Indiana Attorney Disciplinary Commission about Dixon, but the Court agency was consistent with its previous actions and biased against me.  My request was denied.

27

54.     Dixon entered Rodeheffer's email announcing the disciplinary complaint to harm me.  He did it on purpose.

55.     Dixon and Rodeheffer colluded together so that I would be hit with both a malpractice suit and a disciplinary complaint at the same time.

56.     Intentional infliction of emotional distress is a tort available in Indiana.  *Williams v. Tharp*, 889 N.E.2d 870 (Ind. Ct. App. 2008).  Dixon committed this tort.

57.     Dixon's frivolous malpractice suit and exhibits from the Indiana Supreme Court stating disciplinary complaints were being filed were **intentional infliction of emotional distress**, designed to get me to agree to ask my insurance company to settle with him.

58.     He communicated with the ***employment lawyer of my ex-employer***, which happens also to have ***power over my law license***.

59.     Now, it is absolutely incontrovertible that Dixon and Rodeheffer worked together to injure me, and it has caused a great amount of ***pain and injury to me emotionally***.  I am facing the destruction of my legal career from two directions, both intent on revenge for my disability rights work—for my ***having a disability***.

60.     Dixon is not only are trying to get $120,000 from me without merit, but Dixon is cooperating with the Indiana Supreme Court to take away my only active state law license.  That will make it impossible to continue my legal career as a disability rights lawyer.

61.     I have bipolar disorder and this is a condition that affects the emotions, making them more sensitive.

62.     I will prove that Dixon caused me extreme emotional distress just as if a person punched the skull of a person with glass bones syndrome.  Even if I am in remission and am "quite productive," as my doctor says, I still feel emotional attacks such as Dixon's at a higher level and with more pain than a normal person would.

>   Indiana recognizes the tort of intentional infliction of emotional distress as extreme and outrageous conduct intentionally or recklessly causing severe emotional distress to another. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind.1991). The basis of the tort is the intent to cause intentional emotional harm. Id. Conduct is considered "extreme and outrageous" when:

>   the conduct has been so **outrageous in character**, and so extreme in degree, as to go on beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

>   Powdertech, Inc. v. Joganic, 776 N.E.2d 1251, 1264 (Ind.Ct.App .2002)(cited in *Roell v. American Senior Communities*, 20A03-1111-CT-524 (Ind. Ct. App. 2012)).

63.     In the civilized community of lawyers, to attack a disabled man's profession as a lawyer by filing a malicious and fact-less malpractice case and by entering notice of a disciplinary complaint based only on his disability into evidence in that case is "outrageous in character."

64.     Dixon knew I had disabilities because I told him.  He knew Sconiers never asked me to help her find anyone to help with her

29

case.  Dixon knew that Sconiers never asked me to file any lawsuit for her.  He knew that his malpractice case was devoid of merit.

65.     On top of this, knowing that I have disabilities, he filed Rodeheffer's email announcing that she was filing a disciplinary complaint against me.  That complaint was on the basis of my mental disability *status*.

66.     Dixon was punching me in the way only an attorney can do. Frivolous filings and false attacks on my law license hurt me terribly; it was dirty pool, motivated by the Indiana Democratic Party and the Indiana Supreme Court, two organizations against which I have had grievances for years.  Intentional infliction of emotional distress is a tort available to address such attacks.

67.     Dixon must compensate me for the intentional, deliberate, and intense pain he has caused me.  I seek $300,000 for intentional infliction of emotional distress.

68.     I respectfully seek this relief from this Honorable Court.  I also ask for other relief as the Court deems just under the circumstances.

## EEOC CHARGE

69.     As previously mentioned, I have filed a complaint with the EEOC for the Indiana Supreme Court's actions as an ex-employer. These charges are based on violations of the Civil Rights Act of 1964, Title VII, and the Americans with Disabilities Act.  The EEOC charge number is 470-2015-00699.  When the EEOC is done investigating, I may ask the court to merge that case with this one, with the Court's permission.

## REQUEST FOR RELIEF: SUMMARY

70.     Due to the facts recited above and the laws cited in support of relief in each of the above 3 counts, I respectfully request the following relief from this Honorable Court:

71.     Count I: Indiana Supreme Court Intentional Infliction of Emotional Distress, $150,000.  Rodeheffer Intentional Infliction of Emotional Distress, $90,000.

72.     Count II: Indiana Supreme Court Constitutional Torts 42 U.S.C. § 1983: $300,000

73.     Count III: Dixon, Intentional Infliction of Emotional Distress: $300,000

74.     For the reasons given, factual and legal, I respectfully request that this Honorable Court provide the relief described above.

## VENUE

75.     The venue of this case is currently the Northern District of Indiana, South Bend Division.  Venue lies in this District and this Division pursuant to 28 U.S.C. § 1391 because events giving rise to this action occurred in St. Joseph County, Indiana.

## JURY DEMAND

76.     I demand the right of trial by jury for this civil case under the 7th Amendment of the U.S. Constitution.

## JURISDICTION

77.     Jurisdiction over the claims between myself and Thomas M. Dixon and are based on diversity jurisdiction, 28 U.S.C. §1332(a)(1), as the amount in controversy is greater than $75,000. I live in Cook County, Illinois, and Dixon's office is within the

Northern District of Indiana, in Osceola, Indiana.  Jurisdiction over the claim against Rodeheffer is in her personal capacity is also based on diversity jurisdiction, 28 U.S.C. §1332(a)(1) or federal law.  These defendants live in Indiana, either the Northern or Southern District.  The claims based on violations of the 42 U.S.C. § 1983, or 42 U.S.C. § 1985(3) are federal law-based claims and do not require diversity.  *Bell v. Hood*, 327 U.S. 678, 684 (1946) also provides that constitutional violations give rise to federal jurisdiction.

I, Plaintiff Andrew U. D. Straw, verify that to the best of my knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that the above statements and factual representations are true.

Respectfully submitted,

ANDREW U. D. STRAW
1900 E. Golf Rd., Suite 950A
Schaumburg, IL 60173
Telephone: (312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com

January 30, 2015

## CERTIFICATE OF SERVICE

I, Andrew U. D. Straw, certify that I filed the above AMENDED COMPLAINT with the Court via its electronic CM/ECF system on January 30, 2015, and that the electronic CM/ECF system will serve the AMENDED COMPLAINT on all counsel of record and *pro se* parties.

When initiated, the St. Joseph County Superior Court was a defendant for purposes of the injunctive relief, and is represented by the Indiana Attorney General.  Several Attorney General attorneys are receiving notice in the CM/ECF system.

The new party added to this case is Brenda Rodeheffer.  The Indiana Supreme Court is also added as a defendant, as State of Indiana.  All of these parties are employees of the State of Indiana or are the State of Indiana, and therefore currently represented in the case by the Indiana Attorney General.

Respectfully submitted,

ANDREW U. D. STRAW
1900 E. Golf Rd., Suite 950A
Schaumburg, IL 60173
Telephone: (312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com

January 30, 2015